UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DIANE BEAUCHAMP**,   Case No. 1:12 CV 2839

      Plaintiff,   Magistrate Judge James R. Knepp II

  v.   MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

      Defendant.

### INTRODUCTION

Plaintiff Diane Beauchamp seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on June 22, 2009, alleging a disability onset date of November 26, 2007, due to diabetes, neuropathy in her legs and feet, and high cholesterol. (Tr. 131, 152, 196). Her claim was denied initially and on reconsideration. (Tr. 42-52). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 72). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 6, 21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On November 14, 2012, Plaintiff filed the instant case. (Doc. 1).

1

**FACTUAL BACKGROUND**

*Vocational and Personal Background*

Born December 22, 1953, Plaintiff was 57 years old on the date of the ALJ hearing held June 8, 2011. (Tr. 21, 131). Plaintiff worked as a bank teller from 1994 until 2007, and was a supervisor from 1996 until 1998. (Tr. 26, 34, 145-46, 153-54, 184). She left because she could "no longer stand in one area." (Tr. 26). Plaintiff testified she was diagnosed with diabetes in 2006, and claims it has been unstable since, as she gets "very sweaty, dizzy", blurred vision, and fatigued. (Tr. 28-29, 174-76). She testified she was on a special diet and compliant with medication. (Tr. 29). Plaintiff also testified neuropathy caused constant pain, and she either had "no feeling in the bottom of [her] feet" or tingling, like her feet are asleep all the time. (Tr. 30). Plaintiff said she no longer drives and wears special shoes to clean around the house. (Tr. 30).

Plaintiff's husband filled out a third party questionnaire and indicated he "sees [Plaintiff] grimacing" and hears her complain of cramping, dizziness, and sweating. (Tr. 238). He said her pain is strong and lasts for hours at a time and "sometimes while lying down [Plaintiff] says her feet ache on the bottom." (Tr. 238-39). He helped Plaintiff check her blood sugar and gave her juice if it was low. (Tr. 239). Mr. Beauchamp thought Plaintiff suffered from chronic pain in her feet due to neuropathy and dizziness due to diabetes. (Tr. 239).

Concerning daily activity, Plaintiff testified she ate breakfast, took medicine, and "[did chores] like a normal housewife would do." (Tr. 32). There is some conflicting evidence in Plaintiff's reported activities throughout the relevant period. For instance, Plaintiff testified she performed normal household chores but had to be very careful and sometimes wait for help from her husband. (Tr. 32). Consistent with this testimony is Plaintiff's August 2009 disability report, where she said she could lift up to fifteen pounds and must take breaks when performing

household chores. (Tr. 203). However, in a disability report only a month prior, dated July 19, 2009, Plaintiff reported her husband performed the household chores because she could not stand in one spot for too long. (Tr. 196).

Plaintiff also testified she tried to walk "a little bit" but this usually resulted in foot pain; however, reports show Plaintiff walked regularly, sometimes with a group of friends. (Tr. 33-34 *but see* Tr. 259, 269, 274, 283, 333, 337). Plaintiff testified her husband did all the driving; despite reports from 2009 indicating she drove her son to and from school and her husband to and from work. (Tr. 33, 337). Finally, Plaintiff claimed she falls over when bending or crouching while cleaning or at the grocery store. (Tr. 31).

*Medical Evidence*

**Southwest Family Physicians**

In May 2007, Plaintiff began treating with Karyn L. Abdallah, M.D., at Southwest Family Physicians (Southwest) for diabetes and cholesterol management. (Tr. 283). Plaintiff said she was "trying to exercise by walking dogs" and watching her diet. (Tr. 283). Plaintiff's physical examination was normal, and Dr. Abdallah diagnosed uncomplicated type II diabetes, hypercholesterolemia, and allergic rhinitis, and prescribed medication. (Tr. 283-84).

Plaintiff returned to Dr. Abdallah in December 2007 with complaints of intermittent twitching in her left eye, fatigue, dry mouth, and left leg pain, which resolved the week prior. (Tr. 274). Plaintiff reported walking her dog daily, which resulted in an eight pound weight loss. (Tr. 274). Dr. Abdallah encouraged continued weight loss and exercise. (Tr. 274).

In April 2008, Plaintiff was "feeling well overall" and walked her dog on occasion. (Tr. 269). Plaintiff's weight was up and she admitted to a bad diet and stress eating. (Tr. 269). Dr. Abdallah ordered blood work, which revealed her blood sugar was high. (Tr. 265, 269). Dr.

Abdallah spoke with Plaintiff about weight loss, diet, and regular exercise. (Tr. 270). At a follow-up in May 2008, Plaintiff was feeling well except for some allergy symptoms. (Tr. 263). She was normal on examination and Dr. Abdallah encouraged Plaintiff to "get to work on self care!!!" (Tr. 264).

Plaintiff returned to Southwest and saw Dr. Conrad Lindes, M.D., in August 2008, after feeling light-headed and sweaty while driving. (Tr. 259-61). Plaintiff reported she had not been doing home sugar tests. (Tr. 259). Plaintiff indicated her exercise included "predominantly walking" and she maintained a healthy diet. (Tr. 259). Dr. Lindes noted Plaintiff was not in acute distress and had normal respiratory function. (Tr. 259-60). He diagnosed uncontrolled diabetes and educated her on blood glucose measuring so she could determine what and how much to eat to prevent her glucose levels from increasing. (Tr. 260).

In September 2008, Plaintiff had lost eleven pounds, was working on diet, and walking with friends. (Tr. 333). Plaintiff said she felt fine but had episodes where she felt "flashy/warm/sweaty/blurred vision/cloudy in the head/shaky/tingly off and on". (Tr. 333). Plaintiff said drinking water and lying down typically made the episode pass. (Tr. 333). On examination she was normal and Dr. Abdallah noted her diabetes was uncontrolled "in spite of sugars that aren't necessarily low." (Tr. 334).

Plaintiff followed up in January 2009 and reported a reduction in her medication dose resolved her "whoozy spells." (Tr. 335). Plaintiff maintained weight loss but said she stopped exercising do to numbness on the bottom of her feet. (Tr. 335). Plaintiff's physical examination was normal, with no swelling in her extremities. (Tr. 335-37). Dr. Abdallah diagnosed non-insulin dependent diabetes II and probable neuropathy for foot numbness, and prescribed Neurontin. (Tr. 336).

4

During a March 2009 follow-up, Plaintiff reported she did not take the Neurontin due to cost, but that her feet "haven't bothered her much lately". (Tr. 337). Plaintiff said she was stressed financially, and had to drive her son and husband to and from school and work, respectively. (Tr. 337). She said she continued to walk some for exercise, eat right, and lose weight. (Tr. 337). Dr. Abdallah diagnosed diabetes and continued her medication regimen. (Tr. 337-38).

**James Myers, M.D.**

Plaintiff met with endocrinologist James Myers, M.D., in June 2009 at Dr. Abdallah's request. (Tr. 352-54). Plaintiff's examination was normal, but she complained of "nocturnal foot discomfort." (Tr. 353). Dr. Myers diagnosed type II diabetes and found she "likely has sensory neuropathy". (Tr. 353). He adjusted Plaintiff's medications and referred Plaintiff to a dietician to assist with nutrition and instruct her on the use of a glucose meter. (Tr. 354). Plaintiff met with the dietician several times. (Tr. 349-51).

Plaintiff returned to Dr. Myers in September 2009 and reported "doing better" but complained of feet tingling and requested Dr. Myers to fill out paperwork for disability. (Tr. 404-05). Dr. Myers assessed neuropathy and dyslipidemia, and prescribed Byetta injections. (Tr. 403, 405). In October 2009, Plaintiff returned with disability paperwork. (Tr. 396). She reported foot tingling and that her legs and feet hurt while standing. (Tr. 396). On examination, Plaintiff had no edema and normal pulses in her extremities. (Tr. 396). In December 2009, Plaintiff reported she was "doing okay" but complained the bottom of her feet were cold. (Tr. 395). Dr. Myers assessed neuropathy and continued Plaintiff's medications. (Tr. 395).

Dr. Myers completed a diabetes residual functional capacity (RFC) questionnaire in October 2009, after Plaintiff's second visit. (Tr. 380-83). Dr. Myers said Plaintiff's prognosis

5


was good. (Tr. 380). With respect to clinical findings, Dr. Myers noted Plaintiff's examination revealed normal findings. (Tr. 380). He opined that Plaintiff's symptoms would seldom interfere with attention and concentration, she could tolerate moderate stress, and had no side effects from her medication. (Tr. 380). Dr. Myers found Plaintiff could continuously sit for more than two hours; stand up to ten minutes at a time; and walk less than two hours. (Tr. 381). He also found Plaintiff could not walk any city blocks without rest or severe pain. (Tr. 381). Plaintiff would need to take unscheduled breaks during an eight-hour workday, and would need a job that allowed her to change positions from sitting to standing. (Tr. 381). She could lift up to ten pounds occasionally, never lift twenty to 50 pounds, and had no limitation in repetitive handling, fingering, or reaching. (Tr. 382). He also found Plaintiff could not stoop or crouch, and she should avoid moderate exposure to extreme heat or cold. (Tr. 382). Dr. Myers concluded Plaintiff would be absent from work four times per month. (Tr. 383).

Two months later, in December 2009, Dr. Myers completed a peripheral neuropathy RFC assessment. (Tr. 388-91). He assessed Plaintiff's prognosis as "good", and found she had moderate pain and paresthesis in her lower legs and feet. (Tr. 388). Dr. Myers found Plaintiff could sit for about four hours out of an eight-hour workday, and sit for more than two hours at a time. (Tr. 389). He further assessed Plaintiff could stand and/or walk for less than two hours out of an eight-hour workday, and that she required a job that permitted shifting positions at will from sitting to standing or walking, and unscheduled breaks. (Tr. 389). Plaintiff could occasionally lift up to ten pounds, occasionally stoop, crouch, or squat, and frequently twist. (Tr. 390). Plaintiff had no limitation with grasping, turning, or twisting objects, fine manipulation, or reaching in front or overhead. (Tr. 390). He found her medication might make her drowsy, pain would occasionally interfere with attention and concentration, and she could handle low job

6

stress. (Tr. 388, 390). Dr. Myers felt Plaintiff would likely be absent four days per month. (Tr. 390-91).

**Ossama M. Lashin, M.D., Ph.D.**

In February 2010, Plaintiff sought treatment from Ossama M. Lashin, M.D., Ph.D., for diabetes management. (Tr. 407-10). Plaintiff reported good glycemic control but was concerned her neuropathy was not improving, as her feet were cold and numb all the time. (Tr. 407). On examination, Plaintiff had no joint pain, stiffness, swelling, cramping, or weakness. (Tr. 407). Dr. Lashin found Plaintiff's blood sugar was fairly controlled, and diagnosed controlled type II diabetes with neuropathy. (Tr. 409). Plaintiff returned to Dr. Lashin in June 2010, and complained of constant pain rated as a 9/10 in both feet. (Tr. 429). Her examination was normal, aside from diminished vibration sense in her feet, and his assessment remained the same. (Tr. 426-28).

**Allan M. Boike, D.P.M**.

In April 2010, Plaintiff saw podiatrist Allan M. Boike, D.P.M., for diabetic foot evaluation. (Tr. 445). Initially Plaintiff complained of constant tingling and numbness in her feet, but later clarified it was intermittent. (Tr. 445 *but see* Tr. 449). Plaintiff had no swelling in her feet and her skin was warm. (Tr. 446). Her vibratory sensation was diminished; protective sensation absent; reflexes 2/4 on both sides; but no clonus was noted. (Tr. 446). Plaintiff had full muscle strength in her feet and full range of motion without pain or crepitus. (Tr. 446). Plaintiff was diagnosed with non-insulin dependent diabetes. (Tr. 447).

Plaintiff returned to Dr. Boike for complaints of numbness and burning at the bottom of her feet and stated her blood sugar had been "all over the place recently." (Tr. 452). Plaintiff reported she was taking Cymbalta for her feet "which help[ed] a little." (Tr. 452). Dr. Boike

7

assessed neuropathy and recommended an over-the-counter pain relief cream and prescribed Metanx. (Tr. 453-54).

**Vikram Kumar, M.D.**

In January 2011, Plaintiff saw Vikram Kumar, M.D., for treatment of her diabetes at Dr. Abdallah's request. (Tr. 440). Plaintiff reported she had stopped taking Byetta injections due to complaints of nausea. (Tr. 441). Dr. Kumar diagnosed diabetes type II and neuropathy and changed injections to Victoza. (Tr. 441).

**State Agency Physicians**

On September 19, 2008, state agency physician Maria Congbalay, M.D., assessed Plaintiff's RFC after reviewing medical evidence. (Tr. 311-19). Dr. Congbalay opined Plaintiff could not climb ladders, ropes, or scaffolds; work in unprotected heights or around hazardous machinery; and no commercial driving. (Tr. 311, 314, 316-17). Dr. Congbalay cited Plaintiff's symptoms but noted her physical examinations were essentially normal. (Tr. 316-17).

Ms. Congbalay assessed Plaintiff's RFC again in October 2009, taking into account Plaintiff's neuropathy. (Tr. 371-78). Dr. Congbalay found Plaintiff could occasionally lift and/or carry up to 50 pounds; stand and/or walk about six hours in an eight-hour workday; and sit for total of about six hours in an eight-hour workday. (Tr. 372). Plaintiff could occasionally climb ramps/stairs, never climb ropes or scaffolds, and frequently engage in stooping, kneeling, crouching, or crawling. (Tr. 373).

On February 25, 2010, a second state agency physician, Leigh Thomas, M.D., assessed Plaintiff's RFC. (Tr. 416-24). Dr. Thomas found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry up to ten pounds, and stand, walk, and/or sit (with normal breaks) for about six hours in an eight-hour workday. (Tr. 417). She could occasionally

climb ramps/stairs; never climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, or crawl. (Tr. 418). After taking into account Dr. Myers' opinion, Dr. Thomas found Plaintiff could perform light work with some postural limitations, which was more restrictive than Dr. Congbalay's initial RFC for medium work. (Tr. 422).

**ALJ Decision**

The ALJ found Plaintiff had the severe impairments of diabetes mellitus with peripheral neuropathy, and a history of dyslipidemia, but they did not meet or medically equal a listed impairment. (Tr. 11). The ALJ further found Plaintiff had the RFC to perform a limited range of sedentary work. (Tr. 11). Specifically, Plaintiff could lift and/or carry ten pounds occasionally; stand and/or walk no longer than two hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday. (Tr. 11). She could perform all postural activities at least occasionally but could not climb ladders, ropes, or scaffolds, and must avoid exposure to temperature extremes, work hazards, and foot controls. (Tr. 11).

The ALJ gave little weight to Dr. Myers' assessments because there were no objective medical findings to support his limitations regarding standing, sitting, crouching, or stooping, and Plaintiff did not have a spinal or pulmonary impairment. (Tr. 13-14). Based on VE testimony, the ALJ found Plaintiff acquired work skills from past relevant work that transferred to occupations in the national economy. (Tr. 14). Thus, Plaintiff was not disabled.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

9

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because he failed to provide any analysis at step three as to whether Plaintiff met or medically equaled a listing impairment for diabetes under listing 9.00 – endocrine disorders. (Doc. 17, at 8-10). Plaintiff also argues the ALJ erred in assessing Dr. Myers' opinions. (Doc. 17, at 10-12).

*Step Three Analysis*

"At step three, an ALJ must determine whether the claimant's impairment 'meets or is equivalent in severity to a listed . . . disorder.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 1520(d)(2)). In doing so, an ALJ must compare medical evidence with the requirements for listed impairments at step three. *May v. Astrue*, 2011 WL 3490186, at *7 (N.D. Ohio 2011). If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered conclusively disabled. *Rabbers*, 582 F.3d at 653 (citing § 404.1525(a)). However, it is the claimant's burden to show she meets or equals a listing impairment at step three. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, the court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Plaintiff did not argue she met a listing at the hearing before the ALJ or on appeal to the Appeals Council. (*See* Tr. 25, 250-51). Despite this, and the burden of proof at step three, Plaintiff relies on *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011) (unpublished), to argue her case should be remanded because the ALJ failed to "provide any actual analysis of [her] diabetes" related to endocrine disorders in listings 9.00. (Doc. 17, at 8). In doing so, Plaintiff suggests *Reynolds* created a bright-line rule for remand where an ALJ fails to compare an impairment, considered severe at step two, to a specific listing at step three that was never raised by the plaintiff.

Defendant counters that Plaintiff's reading of *Reynolds* is overbroad and distinguishable from the instant case because the ALJ discussed Plaintiff's diabetes and related conditions at length throughout the decision, Plaintiff failed to make a threshold showing she met a listed impairment, and remand would be futile. (Doc. 18, at 13-17).

*Reynolds* has spawned a number of recent opinions addressing the sufficiency of an ALJ's analysis at step three. *See Makan v. Comm'r of Soc. Sec.*, 2010 WL 7688148, n. 26 (N.D.

Ohio) (collecting cases), *rev'd on other grounds* 2013 WL 990824. In *Reynolds*, the Sixth Circuit ruled that the ALJ erred because he failed "to analyze [the plaintiff's] physical condition in relation to the [l]isted [i]mpairments", noting "[the ALJ] skipped an entire step of the necessary analysis." *Reynolds*, *supra*, at 416. The court found that correction of this error was "not merely a formalistic matter of procedure, for it [was] possible that the evidence [the plaintiff] put forth could meet [the] listing." *Id*.

However, in order for the ALJ to address a listing, Plaintiff has the burden in showing she meets one. Here, Plaintiff never claimed she met a listing, let alone identified one to warrant ALJ analysis. *See Bacon v. Astrue*, 2012 WL 3112366, at*4 (N.D. Ohio) (court acknowledged the holding in *Reynolds* but reiterated plaintiff has the burden at step three and held the ALJ did not err because the plaintiff never identified what listing she met). Despite Plaintiff's failure to identify a listing, the ALJ identified the relevant physical impairments at step two – diabetes with neuropathy – and concluded Plaintiff "[did] not have an impairment or combination of impairments that meets or medically equals one of the listed impairments[.]" (Tr. 11).

The Court cannot stretch the finding in *Reynolds* to apply here. Simply put, doing so would require it to "impose affirmative duties on an ALJ to analyze listings not suggested, much less pressed, by the claimant with the burden of proof." *Bacon*, *supra*, n. 2. "This creates the very real risk that the claimant, who has the burden of proof at step three, will be rewarded for deliberately choosing not to raise specific listing arguments at the hearing." *Id*. Just as the Commissioner is not entitled to *post hoc* analysis of an ALJ's opinion; neither should claimants be permitted to profit from the same. *Jones v. Comm'r of Soc. Sec*., 2012 WL 946997, at *8 (N.D. Ohio).

In addition, remand would be "a formalistic matter of procedure" because the ALJ discussed Plaintiff's functioning related to the listing impairment Plaintiff claims she now meets. Here, Plaintiff claims she meets an "endocrine disorder" under listing 9.00, a listing which became effective the day before the ALJ hearing, on July 7, 2011. *See* Listing 9.00, 76 FR 19696 (April 8, 2011). At this time, diabetes mellitus, and other endocrine disorders, were to be evaluated "under the listings for other body systems." *Id*. For example, diabetes that caused diabetic ketoacidosis should be evaluated "under cardiac arrhythmias under 4.00, intestinal necrosis under 5.00, and cerebral edema and seizures under 11.00." *Id*. Moreover, chronic hyperglycemia – "longstanding abnormally high levels of blood glucose" – caused by diabetes should be evaluated under listings 1.00, 2.00, 4.00, 5.00, and 8.00; and hypoglycemia – abnormally low level of blood glucose which lead to seizures or loss of consciousness – should be evaluated under listing 11.00. *Id*.

Important here, the ALJ discussed Plaintiff's diabetes and symptoms at length, and the evidence clearly shows Plaintiff did not meet or equal any listed impairment in 9.00. Tellingly, Plaintiff does not argue she meets or equals the listing; rather, Plaintiff argues remand is required because the ALJ failed to analyze her impairment as compared to a listing, despite her failure to proffer evidence of the same when she had the burden to do so. Indeed, courts in this Circuit have rejected *Reynolds* when there is not sufficient evidence in the record for an ALJ to conclude a plaintiff could meet or equal a listing. *Bacon*, *supra*, at *5; *Newsome v. Astrue*, 2012 WL 2872154, at *6-7 (N.D. Ohio).

Here, the ALJ discussed Plaintiff's allegations of pain from neuropathy, but pointed to evidence showing she walked for exercise and failed to report such severe symptoms consistently to physicians. (Tr. 12). The ALJ also noted Plaintiff's diabetes was generally

14

controlled and Plaintiff's allegations of severe hypoglycemic episodes were not supported by the evidence. (Tr. 13). Moreover, the ALJ noted Plaintiff was inconsistent with her reports about daily activities. For instance, at times Plaintiff said she performed all the household chores, but at other times said her husband did all the household chores because she could not stand in one spot for too long. (Tr. 13).

Indeed, the record reveals Plaintiff exercised by walking throughout much of the relevant period (Tr. 259, 269, 274, 333, 337), her physical examinations were generally normal (Tr. 259-60, 264, 283-84, 334, 353), and she "[did] chores like a normal housewife would do." (Tr. 32). And while she complained of foot pain on occasion (Tr. 335, 353, 407, 445), at other times she indicated her feet "haven't bothered her much" (Tr. 337); and physical examinations yielded no swelling, full muscle strength, and no edema (Tr. 335-37, 353, 396, 407, 446), despite some diminished vibration sense (Tr. 426-28). Moreover, her diabetes, while uncontrolled at times, was generally well controlled with medication, and Plaintiff was consistently told to exercise and manage her weight as part of her treatment regimen. (Tr. 270, 274, 283-84, 334, 409).

Accordingly, the ALJ did not err at step three and his decision is supported by substantial evidence based on the record as a whole. *See Malone v. Comm'r of Soc. Sec.*, 2011 WL 5520292 (N.D. Ohio) (citing *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

***Treating Physician***

Next, Plaintiff argues the ALJ erred in rejecting Dr. Myers' opinion because he did not discuss each and every limitation provided by Dr. Myers. (Doc. 17, at 10). Defendant counters that Dr. Myers was not a treating source and therefore is not entitled to controlling deference under the regulations. (Doc 18, at 17-20).

15

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

At the outset, Defendant argues Dr. Myers is not a treating source under applicable law. (Doc. 18, at 17-20). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). Physicians who are utilized solely to provide reports for a claim of disability are not considered treating sources. 20 C.F.R. § 416.902 ("We will not consider an acceptable medical course to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.").

Plaintiff saw Dr. Myers four times, and only twice before he rendered his first functional capacity opinion. Depending on the circumstances, two to three visits with a physician is not enough to establish an ongoing treatment relationship. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006). As noted in *Kornecky*, the relevant inquiry is not whether Dr. Myers might have become a treating physician in the future if Plaintiff visited him again. *Kornecky*, *supra*, at 506 (quotations omitted). The question is whether Dr. Myers had an ongoing relationship with Plaintiff to qualify as a treating physician at the time he rendered his opinion. *Id*. Indeed, the treating physician doctrine is based on the assumption that a medical professional has dealt with a claimant and his condition over a long period of time will have a deeper insight into the medical condition than a person who has examined a claimant but once. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (quotations omitted).

Based on the facts before the Court, Dr. Myers does not qualify as a treating source. In total, Plaintiff saw Dr. Myers four times. While Dr. Abdallah referred Plaintiff to Dr. Myers, he rendered a functional capacity opinion after seeing Plaintiff only twice; and a second capacity

17

evaluation after seeing Plaintiff only three times. Notably, Plaintiff presented with disability paperwork both times after her initial visit, despite "doing better." Moreover, Dr. Myers' examinations yielded normal findings (Tr. 396, 380) and at their final meeting Plaintiff reported she was "doing okay" and only complained that her feet were cold (Tr. 395).

Regardless, the ALJ gave Dr. Myers' opinion "little weight" based on lack of objective medical evidence or spinal impairment to support his limitations on standing, sitting, stooping, and crouching.[1] (Tr. 13-14). These reasons touched upon at least two of the regulatory factors an ALJ is required to consider when deciding how much weight to afford to a particular opinion; namely, supportability and consistency of the opinion with the record as a whole. § 416.927; *Ealy*, 594 F.3d at 514.

Plaintiff cries foul because the ALJ did not discuss every limitation provided by Dr. Myers. Simply put, the ALJ was not required to discuss every limitation or piece of medical evidence put before him, especially given that Dr. Myers was not entitled to deference as a treating source. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Bailey v. Comm'r of Soc. Sec.,* 1999 WL 96920, at *4 (6th Cir. 1999) (the ALJ need not discuss every aspect of the record or explain every finding at length).

Important here, substantial evidence supports the ALJ's conclusion that Plaintiff was capable of more than Dr. Myers' extremely limiting physical findings, written after only two visits revealing normal physical examination findings. Indeed, Plaintiff reported significant functionality throughout the relevant period, such as walking daily for exercise for much of that time. (Tr. 259, 263, 269, 274, 283-84, 333, 337, 446). Moreover, her physical examinations were generally normal and she had full strength and range of motion in her feet. (Id.). Dr. Myers' own

---

1. The Court is aware the ALJ accepted, without analysis, that Dr. Myers was a treating physician; however, for the reasons already stated, this Court does not.

18

treatment records indicate Plaintiff was "doing better" in September 2009, his physical examinations revealed no swelling and normal pulses in Plaintiff's extremities, and his RFC assessment concluded Plaintiff's prognosis was good and clinical examination findings were normal. (Tr. 380, 388, 395-96). Moreover, Dr. Lashin's examinations revealed normal findings, fairly controlled blood sugar, and no joint pain, stiffness, swelling, cramping, or weakness in her feet; despite some diminished vibration sense. (Tr. 407, 409, 426-28). While Plaintiff complained of constant foot pain to Dr. Boike, she later clarified it was intermittent. (Tr. 445, 449). And, Dr. Boike's examination revealed Plaintiff had full muscle strength and full range of motion without pain or crepitus, despite some diminished sensation. (Tr. 445, 446, 449).

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ did not err in his treatment of Dr. Myers opinion and his step three finding is supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge